The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dillard. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties and in an approved Form 21 Agreement:
STIPULATIONS
1. Defendant paid plaintiff weekly compensation pursuant to the Form 21 agreement from the date of the injury to the date of the hearing before former Deputy Commissioner Dillard and continuing. In addition, 110 pages of medical and related records were stipulated as true and accurate records and such records were received into evidence.
2. The deposition of Dr. William Brown was taken on June 1, 1993, the deposition of Dr. Frank Pollock was taken on June 11, 1993, and the deposition of Dr. Charles Taft was taken on July 9, 1993. After several extensions of time to complete the record were requested and granted by the former Deputy, plaintiff filed a "Motion to Introduce Evidence Occurring Subsequent to Hearing" on or about October 19, 1993. The former Deputy entered an order on December 8, 1993, allowing plaintiff's request to present additional deposition testimony. Defendant thereafter made a motion to suspend payment of benefits to the plaintiff pending the completion of the medical evidence and closing of the record, and on January 6, 1994, the former Deputy entered an order allowing defendant to suspend further payment of weekly benefits to the plaintiff pending the closing of the record and a ruling in the case.
3. After plaintiff's motion to take additional evidence was allowed, plaintiff took the deposition of Trudy Beck, a physical therapist, on January 6, 1994, the deposition of Robert Gunn Roberts, a counselor, on January 6, 1994, the deposition of Dr. Leon Grobler on January 12, 1994, and the deposition of Dr. Joseph Appollo, a psychologist, on February 14, 1994. All of these depositions were allowed into evidence.
4. On or about March 24, 1994, the plaintiff made a motion for a supplemental hearing and to take further depositions of health care providers who had seen plaintiff after the hearing in this case. On April 7, 1994, the former Deputy entered an order denying plaintiff's request for a further hearing or depositions, and ordered that the record in this case be closed on or before May 31, 1994.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff Donald Druck was born on May 4, 1949, making him forty-one years old at the time of the injury giving rise to this case, and forty-four years old at the time of the hearing before the former Deputy. Plaintiff did not complete high school, but later obtained a GED certificate, and also attended college for one year at Guilford Tech.
2. Prior to becoming employed with the defendant-employer, plaintiff had worked for approximately seven years for an engineering company, and in the process of performing that job, he became familiar with surveying equipment, mapping, using aerial photographs and generally all facets of surveying. Plaintiff also had worked in an assembly position, and had held a position with a bakery as a delivery man. During the time that he held some of these jobs, plaintiff was also employed for intermittent periods by the defendant-employer. In late 1990, several months before the accident giving rise to this case, plaintiff left his position with the bakery, and returned to work for the defendant-employer.
3. On December 19, 1990, plaintiff was working for the defendant-employer, and while working some distance above the ground in a bucket truck, he fell to the ground, landing on his feet.
4. Plaintiff was seen initially at the Stanley Memorial Hospital emergency room, and was transferred for further treatment to Forsyth Memorial Hospital in Winston-Salem. Upon being admitted to Forsyth Memorial Hospital, plaintiff came under the care of Dr. Charles Taft, a board certified orthopedic surgeon. Plaintiff suffered a fracture of the L1 vertebrae, and on December 21, 1990, he underwent surgery which involved the insertion of instrumentation and fusion of the T12 through L2 vertebrae. The purpose of the surgery was to stabilize the fracture and thereby enable the plaintiff to be out of bed and more active while the fracture healed.
5. Plaintiff's surgery proceeded without complication, and plaintiff was hospitalized from December 19, 1990 through December 30, 1990, the normal period of hospitalization for such surgery. Plaintiff's expected period of disability as a result of the surgery would have been six to eight months from the surgery.
6. Defendant promptly admitted liability for benefits under the Workers' Compensation Act and began paying compensation to plaintiff for temporary total disability. They also paid for his medical treatment.
7. Dr. Taft saw plaintiff for follow-up visits periodically through early and mid 1991. On October 18, 1991, Dr. Taft felt that the plaintiff had reached maximum medical improvement, and assigned him a 25% permanent partial disability rating. At that time, Dr. Taft felt that the plaintiff was capable of engaging in work involving lifting of up to 60 pounds, and he discussed with the plaintiff the possibility of returning to a job driving heavy equipment.
8. In December 1991, because plaintiff continued to complain of problems, Dr. Taft performed a myelogram and CT scan, but those tests did not reveal the need for any further treatment. Plaintiff also sought an opinion from Dr. William Brown, a neurosurgeon in Winston-Salem, and pursuant to Dr. Brown's suggestion, plaintiff enrolled in a work hardening program at Comprehensive Medical Rehabilitation Center (hereafter CMRC) in Winston-Salem. After completing the work hardening program, plaintiff was evaluated as being able to work at a light to light/medium level on December 23, 1991.
9. On January 3, 1992, Dr. Brown examined plaintiff and agreed with the 25% permanent partial disability rating assigned by Dr. Taft. He suggested that a functional capacities evaluation be performed, and that evaluation was done on February 6, 1992 at CMRC. The functional capacities evaluation confirmed that plaintiff was able to engage in work with restrictions, and plaintiff was rated as being at the "medium-light" physical level. In light of the functional capacities evaluation and plaintiff's continued complaints of subjective difficulties, Dr. Taft adjusted the lifting restrictions to 25 pounds as of February 13, 1992, but continued to encourage plaintiff to seek employment within those restrictions.
10. As a result of the injury by accident giving rise to this case, plaintiff was unable to work until October 18, 1991 when he was released by Dr. Taft. As of that date, plaintiff remained unable to perform his job duties with the defendant-employer, which required heavy lifting. Plaintiff also then underwent work hardening and a functional capacities evaluation, and was not finally released by Dr. Taft, with modified restrictions, until February 13, 1992. Plaintiff was therefore entitled to temporary total disability benefits from the date of the injury through February 13, 1992.
11. As of February 13, 1992, plaintiff was able to work with restrictions. Although he was still unable to return to his former job, he was able to work in other capacities. Plaintiff, however, made no effort to find alternate employment and did not return to work.
12. Defendant assigned a rehabilitation specialist to assist plaintiff and in April, 1992, defendant's rehabilitation consultant located a telemarketing job for plaintiff which would have required minimal lifting and permitted him the opportunity to return to work within his medical restrictions. Plaintiff refused to attempt the telemarketing job in April, 1992, and he again refused it when it was offered to him in July 1992.
13. Plaintiff was able to perform the telemarketing job at the times it was made available to him. Plaintiff's refusal to attempt this job was not reasonable, and his allegation that he was totally disabled and unable to perform this job was not credible.
14. Plaintiff was last seen by Dr. Taft on April 28, 1992. At that time, Dr. Taft again encouraged plaintiff to return to work in any job that did not require bending or heaving lifting, but plaintiff was not motivated to do so. By this time, the fracture in plaintiff's back was healed, the fusion was solid, and the instrumentation was in its proper place. Dr. Taft did not recommend any further treatment for plaintiff.
15. Instead of attempting a return to work, or returning to Dr. Taft for further evaluation, plaintiff sought treatment on his own at the Pain Clinic at North Carolina Baptist Hospital. Plaintiff was evaluated there in August 1992, and his psychological testing profile was "not one commonly produced by chronic pain patients," and suggested "a strong somatic preoccupation and likelihood that most difficulties in life would be attributed to pain or injury." It was also noted that several family and social circumstances could be providing "re-enforcement for pain-related behavior" or providing models for "poor coping and excess disability." No further psychological treatment was recommended.
16. On August 31, 1992, plaintiff was evaluated by Dr. Frank Pollock, an orthopedic surgeon at North Carolina Baptist Hospital. Dr. Pollock examined plaintiff, and though he found no signs of nerve root involvement or mechanical problems with the fusion that might account for plaintiff's on-going complaints of pain, he recommended removal of the instrumentation that had been inserted in plaintiff's back at the time of the initial surgery. Dr. Pollock felt that because the fracture site was solidly fused, there was no on-going need for the instrumentation, and given the nature of plaintiff's complaints of pain, he felt that the instrumentation might be causing plaintiff's symptoms.
17. On September 30, 1992, Dr. Pollock admitted the plaintiff to North Carolina Baptist Hospital for surgery and removal of the instrumentation. The surgery proceeded without complications, and plaintiff was released from the hospital on October 4, 1992. At the time of his first follow up visit, plaintiff reported that the pain in his back was improved, and on November 9, 1992, Dr. Pollock encouraged the plaintiff to start looking for work with the plan that he would return to work within the next several months.
18. Plaintiff returned to see Dr. Pollock on January 4, 1993, at that time, Dr. Pollock found him to be at maximum medical improvement, assigned him a 30% permanent partial disability rating to the back, and released him to return to work on January 11, 1993 with the only restriction being that he should limit his lifting and bending for at least six to eight months.
19. Although plaintiff initially reported that the surgery performed by Dr. Pollock improved his pain, he soon began to complain again of pain from virtually all activities. Plaintiff has been dissatisfied with any treatment that does not leave him completely free of pain, and although again released to return to work after the surgery by Dr. Pollock, plaintiff failed to make any effort to seek employment.
20. As a result of the surgery performed by Dr. Pollock, plaintiff was unable to work for the period from September 30, 1992 through January 11, 1993. By January 11, 1993, plaintiff was again able to work with restrictions, and he has been employable in a number of jobs at all times since that date.
21. During the time that he was being evaluated and treated by Dr. Pollock, plaintiff was also seen for a second opinion by Dr. David DuPuy, an orthopedic surgeon in Charlotte. On January 27, 1993, which would have been several months after the surgery performed by Dr. Pollock, Dr. DuPuy examined the plaintiff, and concluded that he was at maximum medical improvement, should be assigned a 20% permanent partial rating to his back, and could return to work with a 25 pound lifting restriction.
22. Plaintiff claimed at the hearing that he did not return to work following the release by Dr. Pollock and Dr. DuPuy because he thought he was supposed to receive additional physical therapy before attempting work. However, neither Dr. Pollock nor Dr. DuPuy instructed plaintiff to stay out of work until he received physical therapy, and in fact, plaintiff was released to return to work, with restrictions, at all times after January 11, 1993. As when he had previously been released by Dr. Taft, however, plaintiff was not motivated to return to work.
23. In view of the foregoing, plaintiff has not proven that he has been unable to earn the same wages as he earned for the defendant-employer since January 11, 1993. Plaintiff's actual earning capacity is unknown.
24. Plaintiff sustained a twenty-five (25%) permanent partial disability to his back as a result of this injury by accident.
25. After the hearing in this case, and in fact, several months after the depositions of Dr. Brown, Dr. Pollock and Dr. Taft had been taken, plaintiff began to seek out, on his own, further treatment from other health care providers. Beginning July 19, 1993, plaintiff was seen by Trudy Beck, a physical therapist employed at Lexington Memorial Hospital. Plaintiff underwent physical therapy during July and August, but showed no substantial improvement as a result of the physical therapy. Although plaintiff consistently reported his pain as being a "ten" on a scale of one to ten while being seen by Ms. Beck, she also noticed that he had a suntan, indicating participation in outdoor activities, and on one occasion, plaintiff reported to her that he had been at the beach the weekend before and had done some exercising in the pool there.
26. Beginning August 31, 1993, plaintiff also received counseling from Robert "Pete" Roberts, a counselor whose specialty is marital and family counseling. Roberts is not licensed to practice psychology in the State of North Carolina, and plaintiff was not referred to Roberts by any of the physicians who had treated him. Roberts in turn arranged for plaintiff to be evaluated by Dr. Joseph Appollo, a psychologist with offices in Southern Pines. Roberts and Appollo have an employment relationship whereby Roberts refers patients to Appollo for psychological testing, and sees patients under Appollos' supervision when insurance coverage would otherwise not pay for treatment by an unlicensed therapist. Dr. Appollo saw plaintiff on a few occasions in late 1993 and early 1994, and at that time, plaintiff's primary source of stress was his perceived frustration with the workers' compensation laws, and later, his reported depression because he was no longer receiving weekly workers' compensation benefits. Dr. Appollo felt that plaintiff was suffering problems with concentration and social interactions, but having never seen plaintiff before his injury by accident, and, in fact, during the several years following the injury, Dr. Appollo was unable to say how, if at all, plaintiff's behavior in this regard differed from his pre-injury situation.
27. Plaintiff was also seen in October 1993 by Dr. Leon Grobler, a specialist in spine surgery at North Carolina Baptist Hospital. Plaintiff presented at Dr. Grobler's office in September, 1993, without referral from any other physician, and insisted that Dr. Grobler see him and evaluate his condition. Dr. Grobler examined the plaintiff on one occasion, and ordered additional x-rays and an MRI. Based on his review of those test results, Dr. Grobler felt that plaintiff did not need any further active treatment for his back condition. Although Dr. Grobler, based on his limited contact with the plaintiff, suggested the possibility of plaintiff participating in a further rehabilitation program, he did not prohibit plaintiff from working or find that plaintiff was unable to engage in gainful employment.
28. Prior to the hearing before the former Deputy in this case, plaintiff had been seen by three orthopaedic surgeons, one neurosurgeon, a number of therapists and at least two licensed psychologists. None of these physicians or medical providers recommended that plaintiff have any further psychological evaluation or treatment related in any way to his injury. Plaintiff sought the evaluations by Mr. Roberts and Dr. Appollo in an effort to further avoid attempting to return to work, or in an effort to obtain more favorable evidence for his claim.
29. Following the injury giving rise to this case, defendant provided plaintiff with competent medical care by capable surgeons and other specialists. Plaintiff did not attempt to return to Dr. Taft, the authorized treating orthopaedic surgeon, for further evaluation, and instead sought treatment on his own at North Carolina Baptist Hospital, first at the Pain Clinic and then with Dr. Pollock and later with Dr. Grobler. Defendant is not responsible for the costs incurred by plaintiff in connection with this medical treatment.
30. As to the medical treatment obtained by plaintiff after the hearing giving rise to this case, such treatment was not by referral from any authorized physician, and furthermore was not necessary to effect a cure, give relief, or lessen the period of plaintiff's disability resulting from any condition causally related to the injury by accident. Defendant is not responsible for the costs of treatment by Trudy Beck, Pete Roberts, Joseph Appollo or Dr. Leon Grobler. Further, plaintiff has not shown at this time a need for additional psychological evaluation or treatment resulting from the injury by accident.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of the injury by accident, plaintiff was entitled to compensation for temporary total disability for the periods from December 19, 1990 through February 13, 1992 and September 30, 1992 through January 11, 1993. Defendant has paid compensation for these periods, and plaintiff is therefore entitled to no further recovery for temporary total disability. N.C. Gen. Stat. § 97-29.
2. Plaintiff's temporary total disability ended by no later than January 11, 1993, and as of that date, plaintiff had reached maximum medical improvement as to his injuries related to the accident. Plaintiff is not entitled to any further temporary total disability benefits after January 11, 1993. Ashley v.Rent-A-Car Co., 271 N.C. 76, 84 (1967).
3. Although a claimant may elect between compensation for actual wage loss and compensation for scheduled benefits for permanent partial disability, plaintiff has not proven that he sustained actual wage loss as a result of this injury. Andersonv. Northwest Motor Co., 233 N.C. 372 (1951); Russell v. Lowe'sProduct Distribution, 108 N.C. App. 762 (1993).
4. Plaintiff sustained a twenty-five percent permanent partial disability to his back as a result of this injury, but defendant has previously paid the compensation due to him for this disability and are entitled to a credit. N.C. Gen. Stat. § 97-31
and N.C. Gen. Stat. § 97-42; Moretz v. Richardson Associates,316 N.C. 539 (1986).
5. Plaintiff is entitled to have defendant provide all medical treatment arising from this injury by accident to the extent it tends to effect a cure, give relief or lessen his disability. However, defendant is not responsible for unauthorized treatment sought by plaintiff at North Carolina Baptist Hospital, Lexington Memorial Hospital Physical Therapy, or with Pete Roberts or Dr. Joseph Appollo. Plaintiff is also not entitled to psychological evaluation or treatment at this time. N.C. Gen. Stat. § 97-25.
6. Defendant shall continue to provide medical compensation to the plaintiff in the future so long as such medical treatment would tend to give relief, effect a cure or lessen plaintiff's disability. Future medical expenses would only be appropriate if approved by defendant or authorized by the Industrial Commission.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant is not liable to plaintiff for additional compensation since all compensation due has previously been paid.
2. Defendant shall pay all medical expenses incurred, or to be incurred, by plaintiff as a result of this injury by accident when bills for same have been submitted and approved according to proper Industrial Commission procedure.
3. To the extent not previously paid, defendant shall pay expert witness fees as follows: $225.00 to Dr. William Brown; $215.00 to Dr. Frank Pollock; $300.00 to Dr. Charles Taft; $90.00 to Trudy Beck; $200.00 to Dr. Leon Grobler; $125.00 to Robert Gunn Roberts; and $125.00 to Dr. Joseph Appollo.
4. Each side shall bear it's own costs.
 S/ ________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ________________ THOMAS J. BOLCH COMMISSIONER
S/ ________________ COY M. VANCE COMMISSIONER